Filed 7/16/26  P. v. Ramos CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ABEL ANDREW RAMOS,<br><br>Defendant and Appellant. | F089896<br><br>(Super. Ct. No. MCR047799A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Amanda K. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2016, defendant Abel Andrew Ramos pled guilty to attempted murder, burglary, receiving stolen property, illegal possession of firearms, and attempted escape from prison. Ramos was sentenced to a total term of 21 years to life. In 2024, Ramos filed a petition for resentencing under Penal Code section 1172.6.[1] After appointing counsel and holding an evidentiary hearing, the trial court denied Ramos's petition. On appeal, Ramos argues the denial of his section 1172.6 petition should be reversed because there was insufficient evidence that he possessed the specific intent to kill. We affirm.

## BACKGROUND

### 2013 Arrest and Charges

Around 4:00 a.m. on December 3, 2013, Madera County Sheriff's Deputy Darrell Swengel was engaged in a high speed chase with a red pickup truck. During the chase, Swengel reported gunshots were being fired at him. The pickup was able to escape after driving into an orchard. Later that morning, however, the pickup was discovered abandoned. Law enforcement found a hotel receipt in the pickup that had a room number on it. Officers went to the hotel and arrested Ramos and Mario Valdez.

On December 5, 2013, the Madera County District Attorney filed a 42-count criminal complaint against Ramos, Valdez, and Jose Sanchez. In part, the charging document alleged attempted murder, felon in possession of a firearm, and burglary offenses against Ramos.

### 2014 Preliminary Hearing Testimony

On May 23, 2014, the Madera County Superior Court held a preliminary hearing and heard testimony from Madera County Sheriff's deputies.

#### 1. Swengel's Testimony

Swengel testified in part that he was on patrol and looking for a red Dodge pickup truck with a loud exhaust that had been involved in an attempted gas theft the previous night. Swengel found this truck in Fairmead shortly before 4:00 a.m. and noticed that it

---

[1] All further statutory references are to the Penal Code.

2.

was exceeding the posted 25-mile-per-hour speed limit  Swengel began to follow the pickup and had to drive at a high rate of speed to keep up.  Swengel accelerated to over 100 miles per hour and got within 100 yards of the truck.

As Swengel and the pickup went under an overpass, Swengel heard 10 to 12 popping sounds, which he believed were gunshots.  Swengel advised dispatch that he was pursuing the pickup and had possibly been fired upon; he then engaged his siren and red and blue lights.  Swengel and the pickup kept driving at a speed of around 100 miles per hour.

As they approached an S-curve in the road, the pickup slowed to about 80 miles per hour.  Swengel got to within 100 yards of the pickup and then heard another 10 to 12 shots.  Although the posted speed limit around the S-curve was 55 miles per hour, Swengel explained it was not a real steep turn and someone going 100 miles per hour would not necessarily need to slow down.  After the gunshots ended, the pickup again sped up to 100 miles per hour.

As the pickup came to an intersection, it slowed a little again.  As the pickup slowed, Swengel observed six to eight muzzle blasts coming from the rear slider window of the truck and heard corresponding gunshots.  After the gunshots were fired, the pickup sped up.  Swengel was fairly confident that the occupants of the truck were shooting at him and stayed about a quarter of a mile back while continuing to maintain a speed of about 100 miles per hour.  As they passed a point where the road curved and turned into a different road, Swengel observed more muzzle blasts and testified that the occupants had fired another 10 to 12 gunshots in his direction.

After appearing to nearly hit a tree, the pickup turned off the road, entered an orchard, and stopped.  Swengel became concerned that the occupants were going to ambush him and decided to wait until backup units arrived.  Although other patrol vehicles arrived, the pickup took off and was able to escape through the orchard.

Swengel testified he had been around firearms and was familiar with the sound of gunshots.  Swengel also testified that it was possible for rocks to kick up and hit the

3.

patrol vehicle. But there was no dirt or dust that got kicked up during the pursuit, and the popping noises he heard sounded different from instances in which rocks had hit his patrol vehicle. During the second volley of gunshots, however, Swengel thought he heard something kick up and hit the undercarriage of his patrol vehicle, but he was not sure what that might have been. Further, several days prior to the pursuit, Swengel checked for damage to his patrol vehicle and found none.

In response to questions by defense counsel, Swengel clarified or reiterated that: (1) there were only two instances in which he saw muzzle blasts; (2) he turned on his siren and red and blue lights after the first time gunshots were fired; (3) before each instance of gunfire, the truck would slow down a little and he would get closer to the pickup; (4) the closest that he got to the pickup was between 50 and 100 yards; (5) he was not confident that there were shots being fired at him until the first time he saw muzzle blasts; (6) the third and fourth gunshot volleys occurred after the S-curve; and (7) based on the muzzle blasts, he could tell that a firearm was being pointed in his direction.

### 2.     *Deputy Benny Romiti's Testimony*

In part, Romiti testified to his post-chase observations of Swengel's patrol vehicle. Romiti found a gouge, or a striation/graze, in the lens of the driver's side spotlight. Based on his training and experience, Romiti testified that the graze was consistent with a bullet strike. The spotlight was located six inches to the left and 18 inches in front of the driver's seat. Romiti also learned that other deputies located two bullet strike marks on the undercarriage of the patrol vehicle. Romiti had not inspected Swengel's patrol vehicle prior to the incident.

Romiti also testified about his in-custody interview with Ramos. Ramos said that he and Valdez were leaving a friend's house around 2:00 a.m. or 3:00 a.m. in a red pickup truck and that Valdez was driving. As they left the friend's house, they passed a marked Madera County Sheriff's patrol vehicle and saw the patrol vehicle begin to follow them. Ramos told Romiti that the pickup contained stolen property, including stolen guns, and that Valdez said they should try and get away because there was only

4.

one patrol vehicle following them.  Ramos admitted that he fired more than one gun at the patrol vehicle during the pursuit.  Ramos said that he was shooting at the patrol vehicle because he was nervous due to the pickup being filled with stolen property (including guns) and he was trying to keep the patrol vehicle from getting too close.  Ramos said that he did not have the intent to kill the deputy and only wanted to make the deputy back off so that he and Valdez could escape.

### Ramos's Plea and Sentence

On March 21, 2016, the Madera County District Attorney filed a second amended information.  In relevant part, the second amended information charged Ramos with: attempted murder (§§ 664/187, subd. (a); count 1); burglary (§ 459; count 4); receiving stolen property (§ 496, subd. (a); count 5); illegal possession of a firearm (§ 29800, subd. (a)(1); counts 6, 7); and attempted escape from prison (§ 4532, subd. (b)(1); count 29).

On April 18, 2016, Ramos pled guilty to counts 1, 4, 5, 6, 7, and 29 pursuant to a stipulation.

On May 23, 2016, the trial court imposed the stipulated sentence.  The court imposed a total sentence of 21 years to life as follows:  four years on count 4; two years on count 29, consecutive to count 4; three years each on counts 5, 6, and 7, to run concurrently with count 4; and 15 years to life on count 1, consecutive to count 4.

### Petition for Resentencing

On August 7, 2024, Ramos filed a petition for resentencing under section 1172.6.

On October 23, 2024, the People conceded that Ramos had made a prima facie showing under section 1172.6 and requested that the trial court set an evidentiary hearing.

### Evidentiary Hearing

On April 28, 2025, the trial court held an evidentiary hearing on Ramos's section 1172.6 petition.  At the evidentiary hearing, the trial court considered transcripts from Ramos's May 2014 preliminary hearing and took live testimony from Ramos and members of the Madera County Sheriff's Department.

### 1. *Deputy John Grayson's Testimony*

Grayson testified in part that he recorded in-custody telephone calls by Ramos. In a conversation to possibly Ramos's brother, Ramos said that he was sorry, he did not know what he was doing, he was under the influence of drugs, and he was going to jail because they were shooting at a cop. In a separate call to an unknown person, Ramos said that he had gotten in trouble the previous night for shooting at a cop. Grayson testified that prior to the phone calls, either he or another deputy told Ramos that he (Ramos) was going to jail for shooting at a cop.

### 2. *Sergeant Jeff Noland's Testimony*

Noland testified that he and another deputy took Swengel's patrol vehicle to a garage in order examine it for damage. Noland had extensive experience regarding firearms and bullet strikes. Noland observed what appeared to be a bullet strike on the lower support bracket of the radiator, which was behind the license plate. Because there was no hole in the license plate, Noland testified it appeared that a bullet had ricocheted up off the ground and went up under the license plate and struck the support bracket. The strike appeared to be fresh because it was not covered in dust or grime. Noland also observed a chunk that was missing from the front driver's side tire that appeared to be consistent with a bullet strike. This strike also appeared to be fresh based on the way that the rubber had broken away, and it did not appear that the tire had been driven a considerable distance.

### 3. *Identification Specialist Josephina Roderick's Testimony*

Roderick testified that she processed the pickup. As part of the processing, she found 33 spent .22-caliber shell casings, two .30-caliber shell casings, and nine .38-caliber shell casings.

### 4. *Ramos's Testimony*

Ramos testified that he was a passenger in the red pickup truck, Valdez was the driver, and there were no other occupants. Ramos was not sober and was under the influence of alcohol, marijuana, and methamphetamine. Ramos was aware that there

were firearms in the pickup and that neither he nor Valdez were supposed to possess them.

Ramos testified that Valdez was driving at a high rate of speed and they noticed a vehicle coming up fast behind them. As the other vehicle was coming up, Valdez began to shoot. Valdez had grabbed a .38 revolver with his left hand, pointed the gun out the back window with his left hand across his body, shot five rounds, and held onto the steering wheel with his right hand. Ramos then grabbed a .22 from the floorboard, opened the rear window more, pointed the gun in a downward direction, and began to shoot. Ramos shot the gun in both upward and downward directions because he just wanted to get away and was not trying to hurt anyone. Ramos explained that he had been around firearms since a young age and, if he had wanted to shoot the patrol vehicle, he could have done so.

Ramos admitted that he fired a second volley with a .22-caliber and then shot a .38-caliber pistol, while Valdez shot a .30-caliber in the direction of Swengel. Ramos explained that Valdez grabbed the .30-caliber pistol from the floorboard, held the gun with his left hand, reached across his body, and fired out the back of the pickup over his right shoulder, all while driving the pickup with his right hand. Ramos testified that it was not true that, as the pickup truck would slow down, and Swengel would get closer, gunshot volleys would be fired. After Ramos fired the guns, red and blue lights came on from the vehicle behind them, and Ramos realized that it was a police vehicle. Ramos believed that they needed to escape because they had stolen guns in the pickup. Ramos was also afraid that if they stopped, the police officer would kill them because they had shot at him. Ramos did not discharge any weapons after he saw the red and blue lights come on. The reason that Ramos did not fire any further was because he recognized that law enforcement was following them. Ramos explained that the pickup subsequently hit a tree as they were coming around the corner, but Valdez recovered, drove into an orchard, saw that Swengel did not follow, and escaped out the back of the orchard.

After he was arrested at the hotel, Ramos testified he voluntarily made statements to the deputies. Ramos testified he told the deputies more than once that he was not trying to hurt anyone when he fired out the back of the pickup but was just trying to get away. Ramos also testified he was told he would be going to jail for attempted murder and that he had been arrested for shooting at a deputy. When he said on the telephone that he was going to jail for shooting at a cop, he was not making an admission; rather, he was just repeating what had been told to him by the deputies.

### 5. *Lieutenant Robert Blehm's Testimony*

Blehm testified as rebuttal witness. In part, Blehm testified that he had interviewed Ramos after the arrest. Blehm testified that Ramos initially said he was not in the pickup. Ramos then stated he was in the pickup with Valdez and a third person and that the third person was the one who shot at Swengel. Ramos then said that Valdez was the shooter. Ultimately, Ramos admitted that he was the sole shooter and that he had fired every shot during the chase. Blehm testified that only after he had suggested a scenario in which Ramos was shooting only in order to escape did Ramos admit to firing the guns for the purpose of escaping from the patrol vehicle; Blehm had no recollection of Ramos saying that he fired at the patrol vehicle with the intent to harm the driver.

Blehm also testified that he had extensive experience with firearms and how firearms ejected shell casings. Based on the type of weapons recovered from the pickup, the fact that shell casings were primarily located on the driver's side, and assuming the weapons were fired out the back of the truck, Blehm opined that the .22-caliber and the .30-caliber guns were fired from the passenger side. Because the .38-caliber was a revolver, Blehm had no opinions about the location of the shooter based on the .38 shell casings. However, considering that the driver was driving at 100 miles per hour, Blehm opined it would be virtually impossible or highly unlikely for the driver to have been able to maintain control of the truck and simultaneously fire out the rear window.

8.

*Trial Court's Decision*

On May 5, 2025, the trial court orally denied Ramos's section 1172.6 petition. The court stated it found Ramos's testimony to be not credible and the evidence established beyond a reasonable doubt that Ramos was guilty of attempted murder. Specifically, the court found:

> "Much of the argument of the defense relies on the testimony of [Ramos]. And the Court finds that [Ramos's] testimony was not credible for a number of reasons.
>
> "[Ramos] testified that he didn't realize it was a law enforcement officer until he saw the red lights and siren and, at that time, he stopped shooting. And that is not what happened in this case. The Court—the testimony at the preliminary hearing from … Swengel was, in fact, that after the first volley, he turned on his lights and siren. And there were four volleys of shots in this case. That is inconsistent with [Ramos's] testimony.
>
> "Even more important, [Ramos's] statement to … Romiti, as testified by … Romiti at the preliminary hearing, was that he saw the deputy's patrol vehicle just as—after he left his friend's house in Fairmead and they passed by it, and he saw the patrol vehicle follow their truck. And that is inconsistent with [Ramos's] testimony.
>
> "The Court finds that his testimony that the driver fired shots is also not believable. It is not credible to believe that a driver of a truck trying to elude law enforcement, driving at speeds between 80 and 100 miles an hour, would, at the same time, be shooting a firearm outside the back window of that truck. The Court believes that it was [Ramos] that was shooting at the law enforcement officer.
>
> "[Ramos] testified that … there were two .38-caliber revolvers in the truck, and that—[the] Court does not believe that testimony either. [Ramos] said no guns were removed from the truck. There was only one .38-caliber revolver found in the truck. It is clear from the testimony that that revolver was fired more than six times; that it was reloaded.
>
> "The testimony in this matter is [Ramos] shot at least 44 times at the deputy. [Ramos] even used the words that he shot at a deputy or 'a cop.' The truck slowed down before each volley of shots to better the chances of shooting the deputy, which indicates an intent. The mere number of shots also indicates an attempt. The patrol vehicle was struck at least three times.

9.

The most significant that the Court finds is that the spotlight, within 18 inches of … Swengel, was struck.

"The Court finds that there's beyond a reasonable doubt that [Ramos] is guilty of attempted murder, and the motion under [section] 1172.6 is denied."

On May 27, 2025, Ramos appealed the trial court's decision.

## DISCUSSION

### I.     PARTIES' ARGUMENTS

Ramos avers the trial court improperly inferred that he had an intent to kill Swengel.  Ramos argues the physical evidence does not support an inference of an intent to kill.  Specifically, Ramos points out the deputies could not determine with certainty whether the three marks on the patrol vehicle were actually bullet marks or whether the marks pre-dated the chase; the times the pickup slowed down could have been due to the curves in the road; the number of shots fired without hitting Swengel indicated an intent to frighten but not to kill; and if the three marks on the patrol vehicle were gunshots, then they were ricochets from the ground, which shows he was aiming at the ground.  Ramos also argues the court improperly found his testimony generally to be not credible and unreasonably credited only harmful testimony or focused on minor inconsistencies.

The People contend the trial court's judgment is sufficiently supported.  The People argue substantial evidence shows that Ramos harbored the intent to kill because he fired dozens of bullets at Swengel during a high speed chase, which resulted in Swengel's patrol vehicle being struck three times.  The People argue that Ramos's contrary arguments are improper requests to reweigh the evidence.

### II.     LEGAL STANDARDS

#### A.     Section 1172.6

In 2019, the Legislature altered the substantive law of murder by:  (1) narrowing the scope of the felony-murder rule, and (2) for non-felony-murder cases, requiring that a principal in a crime must act with malice aforethought, but prohibiting malice from being imputed to a person solely because of his participation in a crime.  (*People v. Curiel*

10.

(2023) 15 Cal.5th 433, 448–449; see also *People v. Emanuel* (2025) 17 Cal.5th 867, 879–880 (*Emanuel*).)  The Legislature also provided for a petition for resentencing to those who had been previously convicted of murder under a theory that had been amended by the 2019 law.  (*Emanual*, at p. 880; *Curiel*, at p. 449; § 1172.6.)  If a defendant files a petition for resentencing that includes an attestation that he could not presently be convicted of murder or attempted murder in light of the 2019 legislative changes, and the trial court finds that the defendant has made a prima facie case for relief, then the trial court must issue an order to show cause and hold an evidentiary hearing.  (*Emanuel*, at p. 880; *Curiel*, at pp. 449–450; see § 1172.6, subds. (a)(3), (c).)  At the evidentiary hearing, the prosecution bears the burden to prove beyond a reasonable doubt that the defendant is guilty of murder or attempted murder under existing law.  (*Emanuel*, at p. 880; *Curiel*, at p. 450.)  At the evidentiary hearing, the trial court acts as an independent factfinder (*People v. Gudiel* (2024) 107 Cal.App.5th 848, 858 (*Gudiel*)), and it may consider the evidence admitted at the defendant's prior trial as well as new or additional evidence offered by the parties (*People v. Oyler* (2025) 17 Cal.5th 756, 836 (*Oyler*)).  If the prosecution fails to meet its burden, then the defendant's murder conviction must be vacated, and the defendant will be resentenced on any remaining charges.  (*Emanuel*, at pp. 880–881; *Oyler*, at p. 836.)

The denial of a section 1172.6 petition following an evidentiary hearing is reviewed for substantial evidence.  (*Emanuel, supra*, 17 Cal.5th at p. 885; *People v. Reyes* (2023) 14 Cal.5th 981, 988.)  Under this standard, appellate courts view the record " ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Reyes*, at p. 988; see *Emanuel*, at p. 885.)  Appellate courts must presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial.  (*Oyler, supra*, 17 Cal.5th at p. 820; *Gudiel, supra*, 107 Cal.App.5th at p. 858.)  Appellate courts will not reweigh

evidence or reassess witness credibility, and all evidentiary conflicts and questions of credibility are resolved in favor of the judgment. (*Oyler*, at p. 820; *People v. Grandberry* (2025) 116 Cal.App.5th 934, 946; see also *People v. Alvarez* (2025) 18 Cal.5th 387, 470 (*Alvarez*) ["[I]t is the exclusive province of the [finder of fact] to determine the credibility of a witness …."].) The power of reviewing courts to assess the sufficiency of the evidence begins and ends with a determination as to whether any substantial evidence supports the conviction. (*People v. Bassett* (1968) 69 Cal.2d 122, 138; *People v. Ghipriel* (2016) 1 Cal.App.5th 828, 832.) As long as the circumstances reasonably justify the jury's findings, the conviction may not be reversed simply because the circumstances also may reasonably be reconciled with a contrary finding. (*Oyler*, at p. 820.)

### B.  Attempted Murder

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Because direct evidence of an intent to kill is rare, the intent to kill ordinarily is inferred from the defendant's statements and actions and the circumstances surrounding the crime. (*Ibid*.; *People v. Foster* (2021) 61 Cal.App.5th 430, 440.)

### III.  ANALYSIS

The trial court found beyond a reasonable doubt that Ramos was guilty of attempted murder. Implicit within this conclusion is the necessary finding that Ramos intended to kill Swengel. (*People v. Canizales*, *supra*, 7 Cal.5th at p. 602.) Viewing the evidence in the light most favorable to the trial court's judgment (*Emanuel*, *supra*, 17 Cal.5th at p. 885), we are satisfied that substantial evidence supports the court's implicit finding (*People v. Orozco* (2012) 209 Cal.App.4th 726, 735; *People v. Pacheco* (1972) 27 Cal.App.3d 70, 78). Specifically, it is well established that, irrespective of whether a bullet hits its mark, purposefully shooting a firearm at another person without legal excuse and at close range generally gives rise to an inference that the shooter acted with an intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 742; *People v. Foster*, *supra*, 61

Cal.App.5th at p. 440.) That inference is supported in this case because the court's oral findings and the surrounding circumstances show that Ramos knew Swengel was law enforcement and shot multiple rounds and volleys at Swengel at a relatively close range in order to kill Swengel and escape the pursuit.

First, the trial court accepted Romiti's testimony regarding postarrest statements by Ramos. In one such statement, Ramos confirmed that he and Valdez passed Swengel's patrol vehicle and saw when the patrol vehicle began to follow them. Although Ramos testified that he did not know that a sheriff's patrol vehicle was following until after shots had been fired and after Swengel turned on the red and blue lights, the court was not required to believe Ramos's testimony over Romiti's. (*Alvarez*, *supra*, 18 Cal.5th at p. 470; *Oyler*, *supra*, 17 Cal.5th at pp. 820, 827.) Therefore, the trial court could conclude Ramos knew that the vehicle approaching him was law enforcement before any shots were fired. (*Oyler*, at p. 820; *Gudiel*, *supra*, 107 Cal.App.5th at p. 858.)

Second, the court found that Ramos, and only Ramos, fired shots at Swengel. This finding is supported by Blehm's rebuttal testimony. Blehm testified that Ramos gave multiple postarrest accounts of the shooting but ultimately admitted that he alone had fired all shots. Additionally, Ramos admitted that he fired a .22-caliber and a .38-caliber in Swengel's direction. Although Ramos testified that Valdez shot first and also fired two different guns, the court disbelieved this testimony. Considering Ramos's rather implausible description of Valdez reaching across his body and shooting the gun with his left arm across his body, all while steering with his right hand and driving at over 100 miles per hour, the court had more than a sufficient basis to disbelieve Ramos. (*Alvarez*, *supra*, 18 Cal.5th at p. 470; *Oyler*, *supra*, 17 Cal.5th at pp. 820, 827.)

Third, and relatedly, in two separate recorded phone calls after he was arrested, Grayson testified that Ramos admitted to having shot at a cop. Although Ramos testified he was not making an admission but was only repeating what he had been told by the deputies, the trial court was not required to believe Ramos's explanation. (*Alvarez*, *supra*, 18 Cal.5th at p. 470; *Oyler*, *supra*, 17 Cal.5th at pp. 820, 827.) Moreover,

13.

Grayson described that Ramos apologized to a possible family member and tried to blame drugs for his actions. This indicates that Ramos knew he had engaged in unlawful behavior and had indeed shot at cops, but that he was trying to mitigate his actions by blaming drug use.

Fourth, Swengel's testimony shows that he was fired upon on four separate occasions. On each occasion and right before shots were fired, the pickup truck slowed down, which caused Swengel to get closer to the truck. Once Swengel was close, Ramos fired a total of 44 rounds over the course of four separate volleys. Further, Ramos admitted that he and Valdez were scared and did not want to get caught because they were unlawfully in possession of stolen firearms and had shot at Swengel. The trial court could infer from Ramos's knowledge of his own unlawful conduct, the number of shots fired, the number of separate volleys fired, and the slower speeds and shorter distances involved when the shots were fired (which would make hitting Swengel easier) that Ramos acted under a concerted plan and intent to shoot Swengel and thus, end the pursuit and ensure escape without further police interference. (See *Oyler*, *supra*, 17 Cal.5th at p. 820; *Gudiel*, *supra*, 107 Cal.App.5th at p. 858; see also *State v. Smith* (La. Ct. App. 2d Cir. 2024) 400 So.3d 1244, 1250 ["[F]light and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience."].)

Fifth, and finally, the testimony of Noland and Romiti indicated that the patrol vehicle was struck three times by bullets: once in the middle of the undercarriage, once on the driver's side front tire, and once on the driver's side spotlight. Although the deputies could not definitively say that bullets had hit the vehicle, the facts that the patrol vehicle was being shot at hours before it was examined, the marks were consistent with bullet strikes, and the marks did not appear to be old are sufficient for the trial court to have concluded that Swengel's patrol vehicle was actually hit by three rounds fired by Ramos. (*Oyler*, *supra*, 17 Cal.5th at p. 820; *Gudiel*, *supra*, 107 Cal.App.5th at p. 858.) The court could reasonably infer that because the vehicle was struck three times, and with

14.

one of the strikes coming within inches of hitting Swengel, Ramos was attempting to shoot Swengel. (*Oyler*, at p. 820; *Gudiel*, at p. 858.)

Ramos argues the trial court's credibility determinations were unreasonable and that it was improper to credit only his harmful testimony. However, as the trier of fact, it was entirely within the court's prerogative to believe some aspects of Ramos's testimony and disbelieve others. (*In re Lopez* (2023) 14 Cal.5th 562, 591; *People v. Brown* (2014) 59 Cal.4th 86, 106–107.) Further, the court as the trier of fact made credibility determinations and resolved conflicts in the evidence by accepting the testimony of the deputies and largely rejecting the testimony of Ramos. (*Alvarez*, *supra*, 18 Cal.5th at p. 470; *Oyler*, *supra*, 17 Cal.5th at pp. 820, 827.) This was appropriate as there was nothing in the deputies' testimony that was so outlandish or improbable that the court should have rejected it. (See *Oyler*, p. 827.) To the contrary, it was Ramos's testimony regarding Valdez shooting that was improbable, and Blehm's rebuttal testimony indicates that Ramos was shifting his stories about his role in the shooting. Both of these considerations reflect negatively on Ramos's credibility. In short, we accept the court's credibility determinations regarding Ramos's testimony. (*Alvarez*, at p. 470; *Oyler*, at p. 820.)

Ramos also argues the evidence shows he did not intend to kill Swengel because none of the deputies could definitively say that any of the three strikes to the patrol vehicle were actually caused by bullets as opposed to rocks, the truck could have been slowing down due to road conditions, and the number of shots fired were indicative of an attempt to escape. However, that substantial evidence may support findings that are contrary to the court's judgment is not dispositive. (*Oyler*, *supra*, 17 Cal.5th at p. 820; *People v. Helzer* (2024) 15 Cal.5th 622, 646.) On a substantial evidence review, we are obligated to view the evidence in the light most favorable to the judgment and make inferences in favor of the evidence; we do not reweigh the evidence or view it in the light most favorable to a rejected defense. (See *Oyler*, at p. 820; see also *Helzer*, at p. 646.) Ramos's arguments essentially amount to an improper invitation to reweigh the evidence,

which we will not do.  (*Oyler*, at p. 820.)  Because substantial evidence exists that Ramos had the specific intent to kill Swengel, our review must end.  (*People v. Bassett*, *supra*, 69 Cal.2d at p. 138; *People v. Ghipriel*, *supra*, 1 Cal.App.5th at p. 832.)

Accordingly, we conclude that substantial evidence supports the trial court's findings and the denial of Ramos's section 1172.6 petition.

## **DISPOSITION**

The judgment is affirmed.

HARRELL, J.

WE CONCUR:

FRANSON, Acting P. J.

DESANTOS, J.